

**SO ORDERED.**

**SIGNED this 15 day of November, 2012.**

                                                   **Stephani W. Humrickhouse**
                                                   **United States Bankruptcy Judge**

_____

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

| | |
|---|---|
| **IN RE:** | **CASE NO.** |
| **ANDERSON HOMES, INC.** | **09-02062-8-SWH** |
| Debtor | |
| **RICHARD D. SPARKMAN, TRUSTEE** | |
| Plaintiff | **ADVERSARY PROCEEDING NO.** |
| v. | **11-00232-8-SWH-AP** |
| **QUEENSCAPE, INC.** | |
| Defendant. | |

### ORDER GRANTING SUMMARY JUDGMENT

Before the court are cross-motions for summary judgment filed by the defendant, Queenscapes, Inc. (the "defendant"), and the chapter 7 bankruptcy trustee (the "Trustee"). A hearing took place in Raleigh, North Carolina, on August 16, 2012. For the reasons that follow, summary judgment will be granted to the Trustee.

## JURISDICTION

The court has subject-matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, and the General Order of Reference entered by the United States District Court for the Eastern District of North Carolina dated August 3, 1984. Both parties agree that the issues presented are core proceedings and pursuant to 28 U.S.C. § 157(b)(2)(F), final orders or judgments may be entered by a bankruptcy court.

## FACTS AND BACKGROUND[1]

On March 16, 2009, Anderson Homes, Inc., Bridgewater Land Resource, LLC, Land Resource Group of Raleigh, Inc., and Vanguard Homes, Inc. filed voluntary petitions seeking relief under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Eastern District of North Carolina. The cases were consolidated for procedural purposes and joint administration, with Anderson Homes, Inc. being designated as the lead case on the proceedings. Anderson Homes, Inc. (the "debtor") was the parent company with the other three entities being wholly-owned or substantially related subsidiaries. On July 21, 2009, defendant filed proof of claim number 191 in the amount of $42,324.95. On June 30, 2010, the cases were converted to chapter 7 and Richard D. Sparkman was appointed as the chapter 7 trustee of the four consolidated cases.

On June 29, 2011, the Trustee filed this adversary proceeding pursuant to § 547(b) of the Bankruptcy Code to avoid and set aside certain transfers made within the ninety (90) days prior to the filing of the petition ("Preference Period") by the debtor to the defendant. During the Preference

---

[1] All factual disputes in this matter were resolved by the parties and set forth in a Stipulation of Undisputed Facts filed with the court prior to trial. See Stipulation of Undisputed Facts [Docket No. 26]. The only remaining disputed fact amongst the parties is with regards to whether the alleged 90-day letter was provided by debtor to the defendant, as discussed herein.

Period, the debtor made five transfers by check to the defendant in the aggregate amount of $20,161.38: check no. 16470 for $4,105.35 issued on December 31, 2008, check no. 16702 for $4,492.68 issued on January 9, 2009, check no. 16906 for $5,045.50 issued on January 30, 2009, check no. 17009 for $3,518.45 issued on February 6, 2009, and check no. 17227 for $3,089.40 issued on February 20, 2009.  On September 8, 2011, defendant responded to the Trustee's complaint to avoid the preferential transfers and asserted the affirmative defenses of new value pursuant to § 547(c)(4) and ordinary course of business pursuant to § 547(c)(2).  Both parties stipulated that the five transfers constitute preferential transfers pursuant to 11 U.S.C. § 547(b) which may be avoided by the trustee absent any affirmative defenses.

Subsequently, the parties stipulated that the defendant provided new value within the statutory terms of § 547(c)(4) in the total amount of $6,551.  The parties continue to disagree however as to whether all or some of the remaining $13,610.38 in transfers qualify for the ordinary course of business defense under § 547(c)(2).

## STANDARD OF REVIEW

Pursuant to Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056.  In evaluating a motion for summary judgment, a material fact is one that "would constitute or would irrevocably establish any material element of a claim or defense." Prior v. Pruett, 550 S.E.2d 166, 170 (N.C. Ct. App. 2001) (citations omitted).  The standard provides that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;

3

the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

In evaluating the parties arguments on a summary judgment motion, "the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). "[T]he plain language of [the Rule] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## DISCUSSION

Section 547(b) of the Bankruptcy Code provides that the trustee may avoid certain transfers made by a debtor during the Preference Period if he or she meets certain statutory requirements. See 11 U.S.C. § 547(b). The trustee has the initial burden of proving the avoidability of a transfer. 11 U.S.C. § 547(g). In this case, both parties have stipulated that the five transfers at issue all meet the statutory requirements of § 547(b) and are considered preferential transfers within the meaning of the Code.

Section 547(c) of the Bankruptcy Code sets forth several affirmative defenses to avoidance of a preferential transfer. The burden shifts to the defendant to prove the nonavoidability of a preferential transfer pursuant to an affirmative defense. 11 U.S.C. § 547(g). Defendant has asserted two affirmative defenses under Section 547(c) of the Code: new value and ordinary course of business. The parties stipulated that the defendant has a proper new value defense in the amount of $6,551. See 11 U.S.C. § 547(c)(4).

Defendant has asserted that the preferential payments made to it in the amount of $13,610.38 are not avoidable under its asserted ordinary course of business affirmative defense. A preferential transfer is not avoidable

> to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was - (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or (B) made according to ordinary business terms[.]

11 U.S.C. § 547(c)(2).

Section 547(c)(2) was amended in 2005 by the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") to modify what was formerly a three-pronged conjunctive test into a disjunctive test.[2] It was "the simple expedient of changing an 'and' to an 'or,' but the defense 'changed dramatically.'" Nat'l Gas Distribs. v. Branch Banking & Trust Co. (In re Nat'l Gas Distribs.), 346 B.R. 394, 400 (Bankr. E.D.N.C. 2006) (quoting Charles J. Tabb, The Brave New World of Bankruptcy Preferences, 13 Am. Bankr. Inst. L. Rev. 425, 428 (2005)). The recommendation to change the statutory test was adopted by the National Bankruptcy Review

---

[2] Prior to the BAPCPA amendments, § 547(c)(2) provided:

> (c) The trustee may not avoid under this section a transfer -
> (1) . . .
> (2) to the extent such transfer was - -
>
>> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
>>
>> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>> (C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2) (1994).

Commission ("NBRC"), which was then adopted by Congress and included in BAPCPA. The NBRC recommendation report explained that:

> [t]he Recommendation adopts the view that the conduct between the parties should prevail to the extent that there was sufficient prepetition conduct to establish a course of dealing. A disjunctive test telescopes the ordinary course inquiry on the course of conduct between the parties. In the event there is not sufficient prepetition conduct to establish a course of dealing, then industry standards should supply the ordinary course benchmark. Quite often industry standards are extremely difficult to ascertain outside bankruptcy and difficult to prove in the context of preference litigation. Thus, it is more accurate to rely on the relationship between the parties.

Id. at 401 (quoting NBRC Report, G Collier on Bankruptcy App. Pt. 44 at App. Pt. 44-798 (Alan N. Resnick and Henry J. Sommer, eds., 15th ed. rev. 2005)). Despite the NBRC recommendation, as written the statute allows either § 547(c)(2)(A) or § 547(c)(2)(B) to be used independently from each other as a course of business defense regardless of the amount of prepetition conduct and history that exists between the parties. As the statute currently reads, it requires the creditor to carry the lighter burden of proving that the transfer was made in accordance with the standard practice between the parties **or** in accordance with the industry norms, but not both. Defendant here relies on both tests. The court will evaluate each in turn.

### *§ 547(c)(2)(A) Analysis*

Prior to the BAPCPA amendments, the "ordinary course of business" between the parties prong under § 547(c)(2)(A) was the more heavily weighted prong in the conjunctive test. In Advo-System, Inc. v. Maxway Corp., the Fourth Circuit adopted a subjective "sliding-scale" approach in analyzing what constitutes the ordinary course of business between two parties. 37 F.3d 1044, 1049-50 (4th Cir. 1994) (applying the same approach developed in Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.), 18 F.3d 217 (3d Cir. 1994)). According to the

sliding-scale approach, the length of time that exists between the debtor-creditor relationship prior to the bankruptcy filing is a crucial factor in the analysis. "'The more cemented (as measured by its duration) the pre-insolvency relationship between the debtor and the creditor, the more the creditor will be allowed to vary its credit terms from the industry norm[.]'" Id. at 1049. But on the other hand, "'when the relationship between the parties is of recent origin, or formed only after or shortly before the debtor sailed into financially troubled seas, the credit terms will have to endure a rigorous comparison to credit terms used generally in a relevant industry.'" Id. While this holding was before the BAPCPA amendments, this Fourth Circuit analysis remains instructive in analyzing the ordinary course of business as between this particular debtor and creditor.

In addition to the duration of the relationship between the parties, courts have also looked to other factors in analyzing the prior business dealings between parties. See Angell v. Neff Rentals, Inc., No. 06-00157-8-AP (Bankr. E.D.N.C. Jan. 23, 2008). Our court has held that when "determining whether a payment satisfies the requirements for the ordinary course of business exception, a court should consider the prior course of dealing between the parties, the amount and timing of the payment, and the circumstances surrounding the payment." In re Day Telecommunications, Inc., 70 B.R. 904, 910 (Bankr. E.D.N.C. 1987) (citation omitted). The Court of Appeals for the Fourth Circuit has further stated that the inquiry into the business practices existing between a debtor and creditor is "peculiarly factual." In re Jeffrey Bigelow Design Group, 956 F.2d 479, 486 (4th Cir. 1992).

In this case, the debtor and the defendant began working together sometime on or around November 23, 2005. There are over three years of business dealings between the two parties to evaluate before the debtor filed for bankruptcy. The first issue to address is the timing of payments

made during the Preference Period as compared to the pre-preference period. The defendant argues that the court must choose a methodology for analyzing the payments made during the Preference Period and should use the "deadline" approach instead of the "invoice to payment" approach. The Court agrees with the Trustee that choosing one method over the other to analyze the payments will not make a difference. So long as one methodology is used consistently to evaluate pre-preference payments against the preference payments, both approaches allow an accurate analysis of the differences in payment timing and do not exclude using the other relevant factors in the analysis.

Using the same methodology employed in Neff Rentals, Inc., the court will use the invoice-by-invoice basis numbers, which treat the delay in payment for each invoice equally, irrespective of the amount of that invoice, and look at the time span between the invoice date and payment date. "Late payments may be held to be made in the ordinary course of business, when such payment practices were well-established between the parties." In re Jeffrey Bigelow Design Group, 956 F.2d at 486. Using the facts supplied in the defendant's brief, in the year 2007, the average number of days from the time defendant invoiced the debtor until the time defendant received payment on those invoices was 51 days. In the year 2008, the average number of days from the time defendant invoiced the debtor until the time defendant received payment on those invoices was 58 days. In the 90 day period before the bankruptcy filing, the average number of days from the time defendant invoiced the debtor until the time defendant received payment on those invoices was 108.88 days.[3] The Trustee provided a chart that further analyzed every transaction between the parties made before the Preference Period, looking at approximately 1,300 invoices. For the entire pre-preference period (all transactions prior to December 16, 2008), the average delay from the time defendant invoiced

---

[3] Stipulated facts ¶ 21.

the debtor until the time defendant received payment on those invoices was 48.63 days. The court finds that these figures indicate a substantial change in the parties' dealings during the Preference Period from the pre-preference period. In this case, the average time elapsed between invoice and payment during the Preference Period (108.88 days) exceeds the total pre-preference period average (48.63 days) by 123.89%. Cf. Neff Rentals, Inc., No. 06-00157-8-AP (Bankr. E.D.N.C. Jan. 23, 2008) (the percentage increase between the pre-preference and preference period was 15.99% and was held to be within the ordinary course of business).

The defendant also asks the court to look at some of the Preference Period transfers individually rather than on average as a whole. In Neff Rentals, Inc., the court noted that an isolated outlier payment would not render it outside the scope of the parties' prior dealings. Id. In that case, the pre-preference average for payment of invoices was 56.11 days but during the Preference Period, one invoice was paid off that was 99 days old. Id. Given that some pre-preference payments discharged invoices as old as 186 days old, the court found that this did not invalidate the overall analysis of the parties' course of dealing. Id. In this case, defendant shows twenty instances when debtor made an extremely late payments on earlier invoices, one being over two years old from the date of the invoice to the date of payment. Defendant alleges that since two of the payments made on invoices during the Preference Period were 231 and 176 days old, respectively, from the invoice date, the debtor had established a "pattern" of paying the defendant on invoices between 2-4 times as old as the invoice date and thus was normal in accordance with their past dealings. Given that the parties stipulated that there were approximately 1,300 transactions between the parties as evidenced by the number of invoices submitted, it is a stretch to say that since twenty of those payments were extraordinarily late, debtor had established a pattern (20 invoices that were paid via

9

out-of-the-ordinary payments over a total of 1,300 represents only 1.5%). The defendant has offered no evidence or facts that might lead this court to believe that a handful of anomalous payments is truly representative of the ordinary course of business between the defendant and debtor.

Finally, the court considers any change in circumstance that may have occurred between the defendant and debtor. According to the Stipulated Facts ¶ 20, Mike Queen, owner of the defendant, would testify that the defendant received a letter from debtor in 2008 that announced debtor's intention to alter its payment terms to a 90 day payment schedule (i.e. the defendant should expect payment on an invoice from the debtor within 90 days of the debtor's receipt of that invoice.) Dave Servoss, the former principal of the debtor, would testify that although he cannot be certain, he believes it is unlikely that such a letter was provided to the defendant. In order to receive payment for the work that it performed for the benefit of the debtor, the defendant had always sent invoices to the debtor with the language "TERMS / NET 30," indicating that the deadline to pay the invoice was within 30 days upon receipt of the invoice by debtor. Although no specific date is given as to when the alleged letter was sent and/or received other than generally the year 2008, it is true that every invoice sent by defendant to debtor contained the same "TERMS / NET 30" language regardless of whether it was before or after said alleged letter. Nonetheless, as discussed above, the defendant did accept payments from the debtor that were more than 30 days past the invoice date, despite the fact that it continued to use the "TERMS / NET 30" language.

For purposes of each of the cross-motions for summary judgment, any factual dispute should be viewed in the light most favorable to the non-moving party. Liberty Lobby, Inc., 477 U.S. at 255. Viewing the factual dispute in the light most favorable to the defendant, we assume that the 90 day letter was sent and that the parties mutually understood and agreed that the new terms of payment

10

were on "TERMS / NET 90". The court remains unconvinced that the defendant is able to establish an ordinary course of business under these terms.

First, a change in the payment terms during or immediately prior to the Preference Period is a significant deviation from parties past dealings. See Hechinger Inv. Co. of Del., Inc. v. Universal Forest Prods. (In re Hechinger Inv. Co. of Del., Inc.), 489 F.3d 568, 577 (3d Cir. 2007) (affirming the bankruptcy court's finding that making new credit terms immediately prior to the preference period was so "out of character with the long historical relationship between [the] parties" that the payments were outside of the ordinary course of dealings between the parties); J.P. Fyfe, Inc. v. Bradco Supply Corp., 891 F.2d 66 (3d Cir. 1989) (affirming the district court's finding that changing the payment terms as a result of the debtor's deteriorating financial condition precluded an ordinary course of business defense); Roberds, Inc. v. Broyhill Furniture (In re Roberds, Inc.), 315 B.R. 443, 465 (Bankr. S.D. Ohio 2004) (a change in terms during the preference period was a factor supporting the denial of the ordinary course of business defense).

Second, even if the letter had been sent earlier in 2008 such that it was suitable to establish a change in the course of dealing between the parties, there is no evidence provided that the debtor paid invoices late on the new "Net 90" terms prior to the Preference Period. The only evidence defendant cites is that up until September 2008, debtor's average time between date of invoice and payment was 53 days (making debtor 23 days late on the standard "Net 30" terms). Thereafter, the average time between the date of invoice and payment jumped to 85 days. Assuming that the 90 day letter was sent, payment within 85 days would be *early* on "Net 90" terms, indicating that the first time payment was sent late on "Net 90" terms to the defendant was after the Preference Period has started. This clearly does not establish that late payments on the new "Net 90" terms were within

the parties' ordinary course of business. For this court to acknowledge a change in the ordinary course of business between the parties, defendant needed to provide some evidence that subsequent to the 90 day letter, the payments changed to reflect this new understanding and remained consistent throughout the Preference Period.

In light of all the factors considered in this analysis, the defendant did not establish that late payments made during the Preference Period were standard for the parties and thus were not part of their ordinary course of business.

## *§ 547(c)(2)(B) Analysis*

The defendant also raises the defense that the transfers were made according to ordinary business terms pursuant to § 547(b)(2)(B). The current language of the statute allows this defense to be read as its own stand-alone defense. The majority of federal circuits have agreed that an "ordinary business terms" analysis under the pre-BAPCPA § 547(c)(2) requires an objective application of industry standards. See Nat'l Gas Distribs., 346 B.R. 394 (Bankr. E.D.N.C. 2006). The Court of Appeals for the Fourth Circuit adopted the objective analysis in Advo-System, holding that that prong of the test "requires us to look to the norm in the creditor's industry when determining whether preference payments were made according to ordinary business terms." 37 F.3d at 1048. They further stated that the objective analysis of this section serves two important functions:

> One is evidentiary. If the debtor and creditor dealt on terms that the creditor testifies were normal for them but that are wholly unknown in the industry, this casts some doubt on his (self-serving) testimony. . . . The second possible function of the subsection is to allay the concerns of creditors that one or more of their number may have worked out a special deal with the debtor, before the preference period, designed to put that creditor ahead of the others in the event of bankruptcy.

Id. The court read this prong as requiring that "a creditor prove that the debtor made its pre-petition preferential transfers in harmony with the range of terms prevailing as some relevant industry's norms." Id. at 1050. In proving what is standard in a given industry, the creditor is not required to prove a rigorous definition or credit standard within the industry through evidence, but rather establish a "'range of terms' on which 'firms similar in some general way to the creditor' deal." Sass v. Vector Consulting, Inc. (In re Am. Home Mortg. Holdings, Inc.), 476 B.R. 124, 141 (Bankr. D. Del. 2012).

Both parties agree that due to the financial and economic conditions occurring in the United States in 2008, it was common for those in the same line of business as debtor (i.e. the construction industry) to delay payments due to financial difficulties. See Stipulated Facts ¶ 24. The debtor and the defendant however do not agree on whether the industry standard "formally" shifted to a 60 and/or 90 day payment schedule. Defendant's brief requests that we evaluate the percentages of deviation of payments from the ordinary business terms but this is not the correct analysis; that analysis is only relevant in the earlier subjective standard part of the test under § 547(c)(2)(A). Rather our inquiry here is the objective industry standard.[4] For purposes of summary judgment, in viewing the facts in the light most favorable to the non-moving party, here the defendant, the court assumes that the industry standard did in fact shift to a 60 and/or 90 day payment schedule in or around 2008. Assuming this to be true as the defendant presents in the stipulated facts, the

---

[4] In Neff Rentals, Inc., the court accepted an affidavit of one of the region's credit analysts to provide the standard accounting and payment practices within the industry to establish the standards of payment terms in the construction equipment rental industry. No. 06-00157-8-AP (Bankr. E.D.N.C. Jan. 23, 2008). The only evidentiary facts before the court to consider are those set out in the stipulated facts.

preferential payments at issue were outside of this industry standard. Defendant has also provided no information indicating that payments made later than the 60 and/or 90 day payment schedule were the norm and accepted industry-wide. The defendant has not established that the transfers were made within the ordinary business terms.

## CONCLUSION

Based upon the foregoing, summary judgment is granted to the Trustee and judgment will be entered in the amount of $13,610.38.

**SO ORDERED.**

**END OF DOCUMENT**